IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-00188-04-CR-W-NKL |
| ) | |
| ADRIAN L. DUNN, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Dunn's Motion to Suppress Evidence Recovered From 8717 Kentucky Avenue (doc #381). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On June 11, 2009, the Grand Jury returned a one-count indictment against defendants Alejandro S. Corredor, Cindi M. Corredor, Vincent E. Charles, Adrian L. Dunn, Terrance M. Harris, Roy D. Murray, Danny R. Moore, Cheo D. Miles, Kendall L. Howard, Delondo Bellamy, Dennis L. Westbrook, Dauod L. Holmes, Nicholas L. Lathen and Sean Charles. The indictment charges that between January 1, 2007, and the date of the indictment, all defendants conspired to distribute five kilograms or more of cocaine and fifty kilograms or more of marijuana.

On August 20, 2009, the Grand Jury returned a twenty-four count superseding indictment against the same defendants charged in the original indictment. Defendant Dunn is charged in Counts One and Sixteen. Count One of the superseding indictment charges that between January 1, 2007, and the date of the superseding indictment, all defendants conspired to distribute five kilograms or more of cocaine and fifty kilograms or more of marijuana. Count Sixteen charges that on May 17, 2009, defendant Dunn used a telephone to facilitate the distribution of cocaine.

On December 9, 2010, an evidentiary hearing was held on defendant's Motion to Suppress

Evidence Recovered From 8717 Kentucky Avenue (doc #381).[1]  Defendant Dunn was represented by appointed counsel Christine Blegen.  The Government was represented by Assistant United States Attorney Joseph Marquez.  The Government called Detective Joseph Daneff of the Kansas City, Missouri Police Department and Special Agent Mark King of Homeland Security Investigations, formerly known as Immigration and Customs Enforcement ("ICE").  The defense called no witnesses to testify.

## II.  FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On June 12, 2009, Detective Joseph Daneff and other law enforcement officers were tasked to assist ICE in serving federal arrest warrants for an indictment that had been returned on June 11, 2009.[2]  (Tr. at 6-7, 32-33)  Detective Daneff was assigned to search for a person by the name of Adrian Dunn.  (Tr. at 6)  Prior to the officers being sent out to look for Dunn, a briefing was conducted by Special Agent Scott Francis of ICE.  (Tr. at 6)  The residence information that the officers were given concerning Dunn was that he might be found at 8717 Kentucky in Kansas City, Missouri.  (Tr. at 7)  The DEA, which was also investigating Dunn, had given ICE the address of 8717 Kentucky as an address associated with Dunn during their investigation.  (Tr. at 33-34)  The officers were also briefed that Dunn had been seen in a black Escalade that had been associated with and then seen at the residence.  (Tr. at 21)  Detective Daneff testified that the officers were not given information that Dunn might reside at another residence.[3]  (Tr. at 22)  The officers were also informed that Cheo Miles was likely to be located at 8717 Kentucky.  (Tr. at 24)  In addition to the arrest warrant for Dunn, the officers also had a federal arrest warrant for Miles.  (Tr. at 8)

2. Special Agent King testified that he had not anticipated serving the arrest warrants

---

[1] At the suppression hearing, defense counsel advised that defendant Dunn's other suppression motions (i.e. Motion to Suppress Wire Intercept Evidence (doc #370) and Motion to Suppress All Evidence Not Disclosed On or Before July 6, 2009 (doc #379) did not require a hearing and could be ruled based on the pleadings.  (Tr. at 2-3)

[2] ICE was involved in the case as it focused on the importation of illegal narcotics into the United States from a foreign country.  (Tr. at 32)  ICE did not have the resources alone to execute the multiple arrest warrants so it worked in coordination with other agencies to pursue those people with arrest warrants.  (Tr. at 32-33)

[3] Defense counsel provided the Court with a Kansas City, Missouri Police Department Incident Report wherein on April 24, 2009, Adrian Dunn reported an attempted break-in at 8717 Kentucky Avenue.  (Defendant's Ex. 2)  The Incident Report stated that Dunn advised he was the owner of 8717 Kentucky, but that he rented it out and lived elsewhere.  (Defendant's Ex. 2)

so quickly after the return of the indictment, but after reviewing phone calls intercepted on Alejandro Corredor's phone the morning of June 11, 2009, he learned that Corredor and others were planning on killing people who had robbed a residence utilized by Corredor to distribute drugs. (Tr. at 37) The decision was made to end the investigation. (Tr. at 37) Special Agent King testified that there had already been one act of violence where a person had been shot in this investigation. (Tr. at 37) This information was brought to the attention of the officers who would be serving the arrest warrants as well as information from an anonymous tipster that there was a long gun stored inside or underneath the couch of 8717 Kentucky. (Tr. at 7, 25, 36-37) Special Agent King testified that the number one concern in executing the arrest warrants was officer safety. (Tr. at 37)

3. At approximately 2:00 a.m., Detective Daneff and other members of his squad went to 8717 Kentucky to do a residence check for Adrian Dunn. (Tr. at 7) When they arrived at the residence, Detective Daneff saw a dark-colored SUV that was associated with either Adrian Dunn or Cheo Miles. (Tr. at 8) It was not the black Escalade. (Tr. at 23) A light, coming from what Detective Daneff believed to be a TV, was on inside the residence. (Tr. at 8)

4. The officers proceeded to the front door, knocked loudly and announced, "Police. Come to the door." (Tr. at 8-9) In addition to Detective Daneff, there were approximately six other officers at the front door. (Tr. at 9) The officers were dressed in either department issued blue uniforms or in body armor that was marked "Police" on both the front and back. (Tr. at 9) Cheo Miles came to the door. (Tr. at 9) Detective Daneff recognized Miles on sight. (Tr. at 9) Miles was told the officers had a warrant for his arrest. (Tr. at 10) Miles would not open the heavy storm door which was locked. (Tr. at 10) The officers announced their presence several times. (Tr. at 10)

5. Cheo Miles made a comment that he had been in his house and that he had done nothing wrong. (Tr. at 11) Miles attempted to close the main door. (Tr. at 11) Based on the information the officers had that there may be a gun in the residence, Detective Daneff kicked through the storm door, forcing the main door to remain open, so that the officers could maintain visual contact with Miles. (Tr. at 11) Miles backed up into the living room. (Tr. at 11) The officers told Miles to unlock the storm door. (Tr. at 11) Miles refused to open the door and retreated into another room. (Tr. at 11) The officers had their weapons drawn. (Tr. at 12) The officers commanded Miles to come back into their view with his hands in the air. (Tr. at 12) Miles came back into view, with his hands in and out of his pockets. (Tr. at 12) Detective Daneff testified that he was concerned that Miles might be armed. (Tr. at 12) Detective Daneff continued to order Cheo Miles to unlock the storm door, but Miles refused to comply. (Tr. at 12) At some point, Miles got on his cell phone and said he was calling the police. (Tr. at 13) Approximately fifteen minutes had gone by since the police arrived at the residence. (Tr. at 13) Miles continued to go in and out of view and at one point, went over to the living room couch where the officers had information that a long gun was stored. (Tr. at 13)

6. The officers radioed for the Street Narcotics Tactical Squad to respond to the residence with a tool to open the storm door. (Tr. at 13) The officers intended to breach the door and get Cheo Miles out of the house. (Tr. at 13-14) Breaching the door was necessary in order to take Miles into custody on the federal arrest warrant and for the safety of the officers who were attempting to execute that warrant. (Tr.

3

at 14) As the Tactical Squad was arriving, a female came into view from a bedroom and complied with the officers' orders to show her hands and lie down on the floor. (Tr. at 14-15) The Tactical Squad breached the storm door and Miles was placed under arrest at approximately 2:30 a.m. (Tr. at 14-15, 25, 27)

7. Officers performed a protective sweep of the residence looking for additional persons for officer safety concerns. (Tr. at 15) While conducting the protective sweep, officers observed a semi-automatic pistol underneath the seat cushion of the couch. (Tr. at 29) Detective Daneff testified that officers look underneath couch cushions for people because officers have previously found people to be hiding underneath couch cushions where the bottom of the couch has been removed. (Tr. at 29-30) During the protective sweep, officers had to breach another door, i.e. the door going from the living room/kitchen area into the attached garage. (Tr. at 17) The door was secured with a deadbolt lock. (Tr. at 17) The access to the basement was through the garage. (Tr. at 19) The basement was searched for persons. (Tr. at 20) The officers needed access to all areas of the residence to look for other people who might be in the residence. (Tr. at 18) No persons other than Cheo Miles and the female were found in the residence. (Tr. at 20)

8. The protective sweep was completed at approximately 2:40 a.m. (Tr. at 27) The officers then took pictures of the damage they had caused, i.e. broken floodlights and damage to the storm door and to the interior garage door that were forced open. (Tr. at 20) Detective Daneff testified that the scene was then released to ICE. (Tr. at 21) Detective Daneff and his unit left the scene. (Tr. at 21) No officers were inside the residence when Detective Daneff and his unit left. (Tr. at 28-29)

9. Special Agent King testified that it had been his intention to obtain federal search warrants for 8717 Kentucky and four other residences in Missouri, prior to the arrest of the defendants on the instant indictment, but the investigation had to be shut down sooner that expected. (Tr. at 38) After Cheo Miles was arrested, ICE maintained a presence at 8717 Kentucky while Special Agent King worked to secure a federal search warrant for the residence. (Tr. at 38) Special Agent King was involved in writing the affidavit for the search warrant. (Tr. at 38) Three search warrants for residences in Missouri (Alejandro Corredor's residence, Vincent Charles' residence and 8717 Kentucky) and one search warrant for a residence in Kansas were obtained. (Tr. at 39)

10. The affidavit in support of the search warrant for 8717 Kentucky provided the following with respect to the connection of the residence at 8717 Kentucky and Adrian Dunn:

> 16. On April 12, 2009, at approximately 6:07 p.m., Target Telephone 4 received an incoming push-to-talk call from Kendall HOWARD .... During this call, CORREDOR asked HOWARD if he had "anything good," to which HOWARD replied that he did. CORREDOR advised HOWARD that "his boy is over there on 87th ... is trying to get some." HOWARD advised CORREDOR that he was in Kansas but would head that way. CORREDOR asked if HOWARD could go to "AD's (identified as

4

Adrian DUNN)[4] house" and HOWARD asked if it was on 87th. CORREDOR said, "You know AD." HOWARD advised CORREDOR to tell him (Adrian DUNN) that he would be there no later than 6:30 or 6:45. Through wire intercept activities and source information, it has been determined that Adrian DUNN, aka "AD," is an associate of Alejandro CORREDOR.

(Government's Ex. 5) Special Agent King interpreted this conversation to mean that Corredor was asking Howard to deliver drugs to Dunn at an address on 87th Street and 8717 Kentucky is right off of 87th Street. (Tr. at 40) Further, the affidavit stated:

> 17. On May 2, 2009, at approximately 3:04 p.m., a call between CORREDOR, using Target Telephone 4, and Adrian DUNN was intercepted during which CORREDOR told DUNN that he would drive by in thirty minutes. However, at 3:49 p.m., CORREDOR called DUNN again and DUNN asked [if] CORREDOR would want to come by later because "Cheo" had seen "motherfuckers sitting up there" and that "it was a Taurus or some shit." This conversation is apparently related to the detection of ICE Special Agent Bulman who was conducting surveillance in the area of Adrian DUNN's residence located at 8717 Kentucky in Kansas City, Missouri. Another call between CORREDOR and DUNN was intercepted at 3:50 p.m. during which CORREDOR told DUNN to come to "Zeno's." Zeno has been previously identified during the interception of wire communications as Vincent CHARLES, the primary resident of 8416 E. 92nd Place.

(Government's Ex. 5) Special Agent King interpreted this conversation to mean that Corredor was going to meet with Dunn at 8717 Kentucky, but Dunn told Corredor to not come because surveillance had been detected in the area. (Tr. at 41) Agents, who were monitoring the house at 8416 E. 92nd Place, saw Corredor show up at the residence and they also saw a silver BMW registered to Renee Dunn at the residence. (Tr. at 41) The agents had received information through confidential sources that Adrian Dunn utilized a silver BMW. (Tr. at 41-42) Finally, the affidavit stated:

> 20. On May 26, 2009, at approximately 1:41 p.m., Alejandro CORREDOR, using Target Telephone 4, received an incoming push-to-talk call from Adrian DUNN, aka "AD" .... During this call, DUNN asked CORREDOR how much CORREDOR had left for him. CORREDOR asked DUNN [what] he wanted to do with the "other two." DUNN told CORREDOR that he could bring him "three" because DUNN has spoken to his "dudes" the previous day. DUNN told CORREDOR that he would call him as soon as he dropped off his daughter.
>
> 21. On May 26, 2009, at approximately 2:29 p.m., CORREDOR, using Target Telephone 4, made an outgoing push-to-talk call to DUNN .... During this call, CORREDOR advised DUNN that he could come over and DUNN said that it would be alright. CORREDOR advised DUNN that it would be fifteen (15) to twenty (20) minutes.

---

[4] Special Agent King testified that AD has been identified as Adrian Dunn through voice recognition by a cooperating defendant in this case. (Tr. at 48) Further, through the DEA investigation, DEA agents determined that AD was Adrian Dunn. (Tr. at 48-49)

22. On May 26, 2009, at approximately 2:29 p.m., CORREDOR, using Target Telephone 4, made an outgoing phone call to Danny MOORE, aka "Pops," .... During this call, CORREDOR asked MOORE if he could give him "three (3) dollars" and MOORE says yes. The call breaks very bad at this point, but CORREDOR can be heard to say "AD." The conversation continued with a telephone call at approximately 2:31 p.m., where CORREDOR asked MOORE if he could meet him over at "AD's" and MOORE agreed.

23. Based on intercepted calls between CORREDOR and DUNN, ICE special agents and Kansas City, MO Police Department's (KCPD) Career Criminal Squad detectives responded to the area of the residence that is known to be used by DUNN for narcotics activity, 8717 Kentucky Avenue, Kansas City, MO.

24. On May 26, 2009, at approximately 2:43 p.m., KCPD Detective Reed Buente observed a Blue GMC Yukon ... parked in front of the 8717 Kentucky Avenue address and noted it was occupied by an unidentified subject(s). Records checks indicated this Missouri license plate was not on file with Missouri Department of Revenue.

25. On May 26, 2009, at approximately 2:53 p.m., Detective Buente observed an unidentified black male walk from the residence to the Yukon and get inside. The Yukon departed the area northbound on Kentucky Avenue and then westbound on 87th Street.

26. On May 26, 2009, at approximately 3:02 p.m., SA Scott Francis observed CORREDOR arriving in the area of 8717 Kentucky Avenue, Kansas City, MO. ... Detective Reed Buente confirmed that CORREDOR parked at 8717 Kentucky Avenue and went inside.

27. On May 26, 2009, at approximately 3:53 p.m., CORREDOR, using Target Telephone 4, placed an outgoing phone call to Danny MOORE .... During this call, both CORREDOR and MOORE say "hello" but the connection was bad and they could not hear each other.

28. On May 26, 2009, at approximately 3:53 p.m., an older, two-tone Dodge truck ... arrived at the residence and Detective Buente observed the black male driver carry a duffle bag into the 8717 Kentucky Avenue residence. ICE agents noted this truck had been previously observed at 7509 East 112th Street, Kansas City, Missouri, Danny MOORE's residence.

29. On May 26, 2009, at approximately 4:02 p.m., the GMC Yukon that was previously observed at 8717 Kentucky Avenue returned to the residence. The two black male occupants went inside of the residence.

30. On May 26, 2009, at approximately 4:02 p.m., Detective Buente observed the black male driver of the Dodge truck come out of the residence, return to this truck, and place a black trash bag in the bed of the truck. The subject got back into the truck and departed the area. Detectives and agents conducted a loose surveillance of the truck and observed that it drove to 8416 E. 92nd Place, Kansas City, MO, which is a residence utilized

6

by the CORREDOR DTO.

(Government's Ex. 5)

11. Magistrate Judge Robert Larsen signed a search warrant for 8717 Kentucky at 12:30 p.m. on June 12, 2009. (Tr. at 43; Government's Ex. 5) Special Agent King testified that he did not use any information from the arrest of Cheo Miles in his affidavit to secure a federal search warrant for 8717 Kentucky. (Tr. at 40-41)

12. Special Agent King took the search warrant to the officers who were waiting at 8717 Kentucky. (Tr. at 43) Special Agent King did not assist with the search of the residence. (Tr. at 43) However, Special Agent King did observe the recovery of United States currency from a vehicle in the garage at 8717 Kentucky. (Tr. at 43)

13. Special Agent King testified that a search warrant for a residence covers everything in the residence. (Tr. at 44) According to Special Agent King, the vehicle in the attached garage was within the residence. (Tr. at 44) In addition, a K-9 was involved in the search of the residence and the K-9 alerted to the trunk area of the vehicle. (Tr. at 44) Special Agent King testified that a K-9 was probably used because often houses (and vehicles) have hiding places in the walls and floors and drug evidence can be difficult to find unless you know exactly where to look. (Tr. at 56) Officers at the scene requested a locksmith to come and open the trunk of the vehicle so as not to damage the vehicle. (Tr. at 44-46) Inside the trunk, there was a bag containing $41,000 in U.S. currency. (Tr. at 46)

## III. DISCUSSION

While defendant Dunn's motion states that he seeks suppression of all evidence seized from 8717 Kentucky Avenue, at the hearing, defense counsel advised that defendant seeks only to suppress evidence seized from the garage and the vehicle. (Tr. at 3) In support of his motion, defendant argues that government agents involved in the investigation of the Corredor case knew that Dunn did not reside at 8717 Kentucky Avenue. (Motion to Suppress Evidence Recovered From 8717 Kentucky Avenue (doc #381) at 1) Therefore, defendant argues it was unreasonable for officers to go to 8717 Kentucky for the purpose of arresting him. (Id. at 2) Next, defendant argues that it was improper for officers to remain on the premises of 8717 Kentucky before a search warrant was obtained. (Id. at 3) Defendant further argues that the search warrant did not authorize a search of the garage or the vehicle in the garage, therefore, the officers' actions in breaking the lock to enter the garage,[5] bringing in a drug dog to check the vehicle and bringing in a locksmith to break into the

---

[5]The Court notes that the lock was broken to enter the garage during the protective sweep of the residence, rather than during the execution of the search warrant. (See Fact No. 7, supra)

locked trunk of the vehicle require suppression of the evidence seized. (Id. at 3-4) Finally, defendant argues that an erroneous statement in the affidavit in support of the search warrant for 8717 Kentucky Avenue, i.e. "... I allege that the facts contained in this Affidavit provide probable cause to believe that evidence of [criminal law violations] is present at 912 West 98th Street, Kansas City, Missouri," invalidates the search warrant. (Id. at 4) The Court will address each of defendant's arguments.

      A.    It Was Reasonable For Officers To Attempt To Serve The Arrest Warrant For Defendant Dunn At 8717 Kentucky Avenue

In his motion, defendant Dunn argues that government agents involved in the investigation of the Corredor case knew he did not reside at 8717 Kentucky Avenue based upon a case involving defendant's fiancee, Ladana Gilbert. (Motion to Suppress Evidence Recovered From 8717 Kentucky Avenue (doc #381) at 1) However, no such evidence was presented at the hearing. At the hearing, defense counsel did provide the Court with a Kansas City, Missouri Police Department Incident Report dated April 24, 2009, where, in connection with reporting an attempted break-in at 8717 Kentucky Avenue, Adrian Dunn told police that he was the owner of the residence, but rented it out and lived elsewhere. (See Fact No. 1, supra) No evidence was presented that officers attempting to execute the arrest warrant were aware of the April 24, 2009 Incident Report.

The affidavit provided in support of the search warrant notes numerous instances in April and May of 2009 when Adrian Dunn was present at the residence at 8717 Kentucky Avenue. (See Fact No. 10, supra) The DEA's investigation associated Dunn with the address of 8717 Kentucky Avenue. (See Fact No. 1, supra) Regardless of whether or not Dunn lived at the residence, it was reasonable for officers to believe that Dunn might be found there and, thus, they might be successful in executing the warrant for his arrest at this address. Further, the officers had information that Cheo Miles was likely to be located at 8717 Kentucky Avenue and they, likewise, had a warrant for his arrest. (See Fact No. 1, supra) It was reasonable for the officers to attempt to serve the arrest warrants at 8717 Kentucky Avenue. Defendant's argument for suppression must fail.

      B.    Officers Properly Maintained A Presence At 8717 Kentucky Avenue While

Obtaining A Search Warrant

In his motion, defendant Dunn argues that he "believes" it was unlawful for agents to remain on the premises before a search warrant was obtained. (Motion to Suppress Evidence Recovered From 8717 Kentucky Avenue (doc #381) at 3) Defendant provided no case law to support this "belief."

Following the execution of the arrest warrant for Cheo Miles, Detective Daneff testified that the scene was released to ICE at approximately 2:40 a.m. on June 12, 2009. (See Fact No. 8, supra) The evidence presented at the hearing was that no officers were inside the residence at that time. (Id.) ICE maintained a presence at 8717 Kentucky Avenue while Special Agent King worked to secure a federal search warrant for the residence. (See Fact No. 9, supra) The search warrant was signed at 12:30 p.m. that same day. (See Fact No. 11, supra) Special Agent King took the search warrant to the officers who were waiting at 8717 Kentucky Avenue. (See Fact No. 12, supra) Nothing was presented to the Court to suggest that officers improperly conducted a search of the residence prior to obtaining the warrant. Instead, it would appear that officers merely remained on the scene to ensure that no one entered the residence for the purpose of destroying evidence prior to the execution of the anticipated search warrant. The Court finds nothing improper in the officers maintaining a presence while the search warrant was obtained. Defendant's argument for suppression must fail.

C.   The Search Of The Garage And Vehicle Was Proper

Defendant Dunn argues that because the search warrant did not mention the garage or the vehicle in the garage, evidence recovered from the trunk of the vehicle must be suppressed. (Motion to Suppress Evidence Recovered From 8717 Kentucky Avenue (doc #381) at 3)

Contrary to defendant's argument, case law is clear that a warrant to search a residence for drug-related evidence allows officers to also search an attached garage and vehicles parked in the garage. See United States v. Gorman, 104 F.3d 272, 274 (9th Cir. 1996)("In United States v. Frazin, 780 F.2d 1461, 1467 (9th Cir. 1986), we explained that a warrant to search a residence automatically

authorizes the search of an attached garage because '[n]o reason exists to distinguish an attached garage from the rest of the residence for Fourth Amendment purposes.'"); United States v. Bulgatz, 693 F.2d 728, 730 n.3 (8th Cir. 1982)(court found defendants' argument that search warrant issued did not authorize search of their car parked in garage attached to house contrary to settled law). Because the search warrant authorized the search of the vehicle in the attached garage, the officers' actions in bringing in a drug dog and a locksmith were appropriate. Defendant's argument for suppression must fail.

    D.    <u>The Typographical Error In The Affidavit</u>

Finally, defendant Dunn argues that an error in the affidavit in support of the search warrant, i.e. on page 3 of the affidavit, it states: "... I allege that the facts contained in this Affidavit provide probable cause to believe that evidence of [criminal law violations] is present at 912 West 98th Street, Kansas City, Missouri," invalidates the search warrant and requires suppression of evidence seized pursuant to the warrant. (Motion to Suppress Evidence Recovered From 8717 Kentucky Avenue (doc #381) at 4) Again, defendant provided no case law to support his argument.

The residence is properly identified on the cover page of the Application and Affidavit for Search Warrant. (Government's Ex. 5) In the affidavit itself, the Court counts the address "8717 Kentucky" as being set out eleven times. (See Government's Ex. 5 at ¶¶ 3, 6, 15, 17, 23, 24, 26, 28, 29, 32) Paragraph 3 of the affidavit states: "This affidavit is in support of a search warrant for 8717 Kentucky Avenue, Kansas City, Missouri, which is a single family dwelling located on the east side of Kentucky Avenue, and the eighth structure south of 87th Street." Paragraph 32 states: "I believe that based upon the information contained herein, there is probable cause to believe that the following articles are present at the residence at 8717 Kentucky Avenue, Kansas City, MO: [listing of articles to be seized]." Special Agent King testified that several search warrants related to the investigation were obtained on June 12, 2009. A typographical error was apparently made on page 3 of the affidavit in support of the search warrant for 8717 Kentucky Avenue. However, the affidavit was clearly given in support of a search warrant for 8717 Kentucky Avenue. There is no

basis for suppression.

## IV.  CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Dunn's Motion to Suppress Evidence Recovered From 8717 Kentucky Avenue (doc #381).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                                                                                */s/ Sarah W. Hays*
                                                          SARAH W. HAYS
                            UNITED STATES MAGISTRATE JUDGE